## Simon's Estate.

*Married women—Feme Sole trader—Deed—Deed without husband's joinder—Confirmation.*

Where a married woman executes a deed of real estate without her husband joining therein, and subsequently is declared a feme sole trader, she may thereafter ratify the deed either expressly or by implication; and if after such decree she is a party to partition proceedings in which the land conveyed by her is involved, and she does not repudiate the deed, she will be deemed to have affirmed her deed, and no one else has any standing to complain.

*Res adjudicata—Identity of subject-matter—Partition.*

A decree in partition will not be deemed res adjudicata as to title to land, in a subsequent proceeding involving the validity of a deed between the two parties, where it is not shown that the land described in the deed was included in the partition proceedings, or identical with it. To make a matter res adjudicata there must be, amongst other things, identity of subject-matter.

*Deed—Fraud—Burden of proof—Equity—Evidence—Orphans' court.*

In a proceeding in the orphans' court distributing a fund raised by a sale of real estate, where one of the parties alleges that a deed which he had made of his interest to another of the parties, had been procured from him by fraud, and this allegation is met by a positive denial, the burden of proof rests on the party alleging the fraud, and is the same as if he had been plaintiff in a bill in equity to which a responsive answer had been filed. If the evidence introduced by him to establish the fraud is insufficient in quality or quantity to warrant a chancellor in decreeing a cancelation of the deed, he must fail.

To sustain a decree by which, in effect, a deed which has stood on record without attack for eleven years, is set aside at the instance of the grantor, the evidence must be clear, precise and indubitable; by which is meant that it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testified, that they narrate the details exactly, and that their statements are true.

The orphans' court will not set aside a deed on the ground of fraud where it appears from the grantor's own testimony that the transfer was made upon his own suggestion, without any undue influence, persuasion or misrepresentation on the part of the grantee, that the grantee's denial of any fraud is supported by the testimony of all the witnesses present at the execution of the deed, except the grantor himself, that the deed stood for eleven years on record without attack, and that the motive alleged by the grantor for making the deed was to protect his wife and children from existing or contemplated creditors.

A man who has made a voluntary conveyance of all his property in

fraud of creditors cannot elect to set the conveyance aside, nor enforce a secret trust for his own benefit, or for the benefit of his wife and children. This is in obedience to the general principles that where the parties to a fraudulent contract have fully executed it themselves, courts of equity will not interfere to unravel their doings, but, considering them in pari delicto, will leave them bound as they found them.

*Trust and trustees—Trust ex maleficio—Parol promise—Frauds.*

A trust ex maleficio can only result from some act of bad faith, and a mere refusal to perform a parol contract to hold or convey land is not sufficient to create such trust.

Argued Dec. 10, 1901. Appeal, No. 27, Oct. T., 1901, by Madge Kessler, from decree of O. C. Phila. Co., Jan. T., 1890, No. 346, dismissing exceptions to adjudication in estate of John Simon, deceased. Before RICE, P. J., BEAVER, ORLADY, W. W. PORTER and W. D. PORTER, JJ.

Exceptions to adjudication.

ASHMAN, J., filed an adjudication, the material portions of which are as follows :

After a gift of his estate real and personal to his wife, Sarah Simon, for life, or during widowhood, the testator gave one seventh thereof to each of his children, William, Rebecca, Emma and John absolutely; one seventh to his executors in trust to pay the net income to his daughter Julia for life, and at her death the principal to testator's grandchildren in equal shares, subject to the payment of $200 for the admission of his said daughter, if she should desire it, to the Methodist Home, and to the payment of her funeral expenses; one seventh to his executors in trust to pay the net income to his daughter, Eliza, for life, and the principal at her death to her children and issue per stirpes of her deceased children equally; and of the remaining one seventh he gave one third to his granddaughter, Minnie Griffith, absolutely, and two thirds to such of his six children who should then be living, and the issue per stirpes as should be dead, in equal shares ; the shares of his daughters, Julia Ann and Eliza, to be held upon the same trusts as their original portions. He provided that if his daughter Rebecca should die possessed of the whole or any part of the share so devised and bequeathed to her, then the same should be held by his executors in trust to pay the net

income to her husband for life, and the principal to testator's grandchildren then living, giving power, however, to his daughter to dispose of her estate in any other way than by will. He gave full power to his executors to sell his real estate.

By codicil he provided that, if his son John should die seized of the whole or any part of his share, the said share should go to his said son's children and issue per stirpes, and, in default of issue, to his executors in trust to pay the net income of said share to his said son's wife for life, and the principal at her death to testator's grandchildren then living, but with full power to his said son to alien his said share. The testator died March 30, 1884.

Sarah Simon, the widow and life tenant, died February 9, 1898.

The present account is of the amount derived from sales of real estate and awarded by adjudication of the executor's account, to wit: $11,966.45.

William Simon and Sarah Simon, the executors and trustees named in the will, were dismissed in December, 1892, and the Commonwealth Title Insurance and Trust Company was appointed administrator d. b. n. c. t. a. on May 12, 1893. The balance in cash and securities is $9,604.98; income account shows amount due accountant on income account, $61.90; there has been received since filing, $275.98; balance due estate, $214.08.

     *     *     *     *     *     *     *     *

The share of John Simon, a son, was assigned by mesne conveyances to Madge Kessler.

     *     *     *     *     *     *     *     *

Madge Kessler claimed the interest of John Simon, a son of testator, in the estate, by sundry conveyances, to wit: deed dated October 24, 1888, by John Simon and wife to Julia A. Britton, for one seventh and one sixth of two thirds of one seventh of the estate; deed dated November 24, 1896, from Julia A. Britton to Edward Kessler for the same premises; deed dated April 15, 1897, from Edward Kessler and Madge Kessler, his wife, to Nicholas J. Fitzgerald, for the same, and deed dated April 15, 1897, from Nicholas J. Fitzgerald to Madge Kessler.

It was objected that Julia A. Britton was a married woman,

and that her separate deed is void.   Charles Britton, her hus-
band, was examined, and admitted that he had not lived with
her for nearly thirty years.   He alleged desertion on her part.
Certificate of the court of common pleas ( C. P. No. 1, Decem-
ber term, 1898, No. 820) was produced, declaring Julia A. Brit-
ton a feme sole trader, the petition alleging desertion by the hus-
band for over twenty years.   It is not necessary, however, to
discuss the validity of the deed, under the findings of fact
which the auditing judge thinks are justly deducible from the
evidence.   John Simon, a son of the testator, was a farmer in
a small way, who worked a farm which he leased from Charles
Waters.   In 1888, according to his statement, his rent was
considerably in arrears and a levy had been made by his land-
lord on the stock and other personal property.   Thereupon,
in the summer of that year, he made a bill of sale of his effects
to his sister, Julia A. Britton, and she engaged with the agent
of the lessor to pay the rent in his stead.   In November, 1889,
she sold the property at public sale, realizing therefrom
$1,331.54.   She paid to Mr. Shallcross, the agent, $945, as rent,
but nothing to John Simon.   In October, 1888, Mrs. Britton,
when on a visit to Simon, was asked by him if she would con-
sent to hold his interest in the testator's estate in trust for the
benefit of his wife and children and to protect them from loss
if he should go into business and fail.   He seems to have been
moved to this anxiety and to the necessity for some such ac-
tion by the provision in the codicil of the father's will that in
case of his death without leaving issue his share would ulti-
mately go to testator's grandchildren, unless he should himself
alienate his share.   This seems to be shown by the form of his
question to Mrs. Britton: " If she could take my interest in
the estate and hold it in case anything should happen to me,
for the benefit of my wife and children, so that they could
get what was coming to me, as father wished by his will."
That this belief was encouraged and was used by Mrs. Britton
for her benefit and as a means of misleading him, is evidenced
by her answer to Mrs. Simon.   The latter asked her: " What
does it mean?   Is it really a legal form?" and she replied:
" Oh, no! merely a form, that is all; nothing legal in it.   It
was a form which had no effect.   Certainly you will get it all
back.   This will make you all right if anything should happen

to John." As a result of this request, a deed was prepared by Andrew J. Maloney, Esq., and was executed in his office by John Simon, and subsequently by his wife, conveying John Simon's interest to Mrs. Britton. The execution of the paper was marked, if the testimony of the witnesses was true, by some peculiar incidents. A check of a Mr. Bender, for $1,000, being the amount of the consideration named in the deed, was handed by a Mr. Dickinson to Simon, and this check, immediately after the parties left Mr. Maloney's office, was snatched from the hands of Mr. Simon by Mrs. Britton, who exclaimed, " That is the way we fixed up Aunt Eliza." When Simon was asked by counsel, " What did you say to that?" he replied, " Nothing at all; I thought it was merely a form." Mr. Bender was put on the stand and testified that in 1888 he was twenty-three years of age; that he did not draw the check; and did not have $1,000 in bank. The wife of Simon testified that the purpose of the conveyance was what her husband had described, and she added that she desired her uncle or father as trustee, to which, however, Mrs. Britton would not listen. Mrs. Britton accompanied her to the office where she joined in her husband's deed, and told her the transfer was a pure matter of form. When, some eight years afterwards, her husband had been advised by counsel that he had been swindled, Mrs. Simon called on Julia Britton, and, in answer to the inquiry whether she intended to restore the property, the latter replied, " It just depends on how John acts." Mr. Dickinson, with whom Julia Britton lived, and who advised and assisted her in these transactions, testified that, at the time of the execution and delivery of the deed, Mrs. Britton paid to Simon $50.00 and handed back to him a judgment note for $950 previously drawn by him in her favor. He was unable to say whether this note had not been given in order to secure the payee against the rents which she had assumed, and for which she had taken a bill of sale. The existence of the note was not hinted at by any other party except Mrs. Britton, and it was not mentioned by the witness in his examination in chief. The counsel who prepared the deed and witnessed its execution declared that the consideration, $1,000, actually passed between the parties, but in what shape, as in cash or the equivalent of cash, he had entirely forgotten. It was

shown that in her lifetime the wife of testator had come into possession of some $7,000 as her separate estate, and had divided it equally among her seven children, but had entrusted the share of John Simon to Julia Britton, who admitted to her sister that it had been so given her that she might with it pay John's debts. According to Mr. Dickinson, $700 of this money was so used to his knowledge. With the single statement of Dickinson to the contrary, every item of the foregoing evidence points to the theory that John Simon intended to constitute his sister a mere trustee, with no beneficial interest in herself whatever. The form of the conveyance which he employed is, in a court of equity, immaterial, because equity will so mold the instrument as to accomplish the purpose which was contemplated by the contracting parties. He was a farmer, and apparently unused to business, and was dealing with persons who were unquestionably shrewd. It is unfortunate that Mrs. Britton, who could have cleared up what remains concealed in the case, was not produced as a witness. It was as vital to her side, if its allegations were truthful, that she should give her version of the facts as it was to that of the contestant. The excuse assigned for her nonappearance was that she was sick; but the physicians who testified as to her condition differed essentially in their opinions, and one of them declared that he believed she was shamming. Her deposition, taken in October, 1898, was submitted in which she said that the note of John Simon for $950, turned over by her as part of the consideration for his conveyance, was for the payment of his rent and debts, which she had assumed for him, and these rents, she said, amounted to $875. She declared that the moneys so paid by her had been advanced to her by Dickinson.

The case then stands in this fashion : John Simon parted with his possession of an interest worth probably $12,000 in his father's estate for a consideration expressed to be of $1,000, but which was in reality nothing. Under the bill of sale, which he had executed to his sister before the deed which is now in question, Mrs. Britton had realized $1,331. The rent, which her receipt and the testimony of Mr. Shallcross, the agent of the landlord, showed she had paid, amounted only to $945. This left in her hands $385 belonging to her brother. Mr. Dickinson admitted that she made up the $1,000 consid-

eration named in the deed by $50.00 cash and her brother's judgment note for $950, which she relinquished to him. This note, if it existed at all, was either collateral to the bill of sale spoken of by John Simon, or it was mistaken by him for a bill of sale. Its very existence was apparently unknown to everybody but Mr. Dickinson and Mrs. Britton, and it came to Dickinson's memory as an afterthought. But Mrs. Britton had previously received (a fact which Dickinson himself related), $1,000 from the mother with which to settle the debts of her brother John; and the only proof that she had expended any of the money for that purpose came from Dickinson in the shape of a loose statement that he had himself paid out, at her direction, to John's creditors, $700, to whom, however, he did not see fit to mention. The relief now sought is not against an unconscionable bargain. Grossly improvident as the sale of an interest worth $12,000 for $1,000, supposing that sum to have been paid, would undoubtedly be, it would be merely evidence of fraud, which, standing by itself, would not be ground for rescinding the bargain: Davidson v. Little, 22 Pa. 245.

The relief is asked for on a totally different ground—that a sale was not intended, and that no consideration whatever passed from the trustee to whom the title was transferred. The silence of the grantor during the years which followed the execution of the deed is entirely consistent with the circumstances. There was no occasion for action on his part. He was entitled to no income during the life of his mother, and he believed that the property was safe in the custody of his sister, whose business qualifications he respected, just as his mother did before him.

The conclusion of the auditing judge is that the deed was fraudulently procured by Mrs. Britton, and that there was a resulting trust in favor of the grantor. But the title of a purchaser for value from Mrs. Britton, unaffected with notice of the fraud, would be bound to be respected. It is a significant incident that the deed to Kessler was executed almost immediately after a demand from counsel that she should restore the property to John Simon. The letter of the attorney making this demand was written on November 16, 1896, and the deed to Kessler was dated November 24, 1896. Mrs. Britton

was then living with Dickinson, and had lived with him for many years previously. Her husband, Charles Britton, was examined at the audit, and testified that she had deserted him thirty years ago, and had remained apart from him ever since. It is worthy of notice that in the deed to Kessler it was recited that " Charles R. Britton had departed this life in 1889." Mrs. Britton admitted that the deed was prepared at her instance, and that it was read over to her, but that she had not noticed that recital. She also said, contradicting the evidence of Kessler, whose testimony was that she told him that she desired to avoid the importunities of Simon, that she had sold to Kessler " simply because Mr. Dickinson wanted to be repaid his money." Kessler, the grantee, was a son-in-law of Dickinson, and with his wife, Madge Kessler, also lived with him. He testified that he was importuned by Mrs. Britton to buy the share because, as she said, she was annoyed by John Simon; that he was advised by Dickinson and by Dickinson's counsel to buy; and that he paid $500 in cash and $500 in a note. On the day of the purchase, he and his wife united in a deed of the premises to a third party, by whom they were conveyed back to the wife. Every effort was made by the contestants to secure the attendance of Mrs. Madge Kessler at the hearing, and there is no doubt whatever in the mind of the auditing judge, from the admissions of Kessler himself, which need not be rehearsed, that she was purposely secreted by him in Reading, Pa. At the audit he refused to give her residence. So far from assisting to let in the light upon a transaction in which he and his wife were deeply interested, he did what he could to obscure it. The auditing judge, sitting as a juror, finds that he acted in the matter as an ally of Dickinson. Throughout the occurrences which have been detailed, and those which related to the transfer of another interest hereafter to be noted, the hand of Dickinson was constantly to be seen; and he was the one witness upon whom Mrs. Britton and Mrs. Kessler mainly depended. Kessler and his wife knew that the husband of Mrs. Britton was living, and they accepted Mrs. Britton's deed without his joinder. It is hard to believe that Mrs. Britton would be willing to sell at the same price a property which she had bought at one twelfth of its real value; but there was at the same time every reason why she should place the nominal

title in a third person whom she could control. Mr. Dickinson, who engineered the deed of conveyance from Simon, very appropriately officiated in the conveyance to Kessler, and in his hands both deeds were part of one and the same conspiracy. That Kessler paid any consideration for the conveyance rested on his naked word ; he did not produce the check, nor the note, and he did not account for their nonproduction, and he kept his wife back from the witness stand.

The Act of April 22, 1856, P. L. 533, which was said by AGNEW, J., in Seichrist's Appeal, 66 Pa. 237, to have torn up parol trusts " by the roots," expressly exempts from its operation conveyances of land by which a trust or confidence may arise by implication of law. To adapt the language of the judge to this case, it is not the verbal promise of Mrs. Britton to hold the share in trust which governs, but the fact that she obtained the deed by fraud. A trust ex maleficio is only possible of proof in most instances by parol testimony, and if the act forbidding parol trusts can apply to a trust like the present, it will itself become the instrument of fraud : Church v. Ruland, 64 Pa. 432. The 6th section of the act limits the bringing of actions to enforce an implied trust to a period of five years after the trust accrued with the right of entry, but the proviso declares that the limitation shall run only from the discovery of the fraud. In this case there was nothing whatever to set the grantor in pursuit of a fraud until his accidental interview with counsel; his mother was still in being, and his estate did not vest in possession until her death. The facts are wholly dissimilar from those in Christy v. Sill, 95 Pa. 380, and Barry v. Hill, 166 Pa. 344, etc. In the former of these cases, the plaintiff had notice of the fraud twelve years before he instituted suit, and in the latter the evidence was insufficient to establish a trust.

If the claim of Madge Kessler shall be considered as an application to compel specific performance, on the ground that the deed of Simon was in fact an agreement to convey to the grantee his share when awarded (see Carr v. Williams, 10 Ohio, 305, and Munds v. Cassidey, 98 N. Car. 558, where deeds in terms absolute were held to be mere agreements to transfer), the result will be equally adverse to the claimant. Fraud having been shown, the court will not permit the party who

perpetrated it to profit.   The defendant who resists the application for specific performance is in the same attitude as if he sought for the rescission of the contract; and in each instance the heavier burden is on the plaintiff.   That the court might not rescind the bargain, however, is no reason why it shall not refuse to order its performance.   " Though inadequacy of price is not a ground for decreeing an agreement to be delivered up or a sale rescinded unless its grossness amounts to fraud, yet it may be sufficient for the court to refuse to enforce performance.   It is not uncommon to refuse to enforce for inadequacy and at the same time to refuse to rescind: " Osgood v. Franklin, 2 Johns. Ch. 23.

The claim of Madge Kessler is rejected, and the share in question is awarded to John Simon.   The balance, $385, which appears to have been retained by Mrs. Britton, and perhaps a large portion of the $1,000, which had been entrusted to her by the mother for John's benefit, were probably disposed of in the payment of Simon's rent which accrued after the date of the bill of sale or judgment note.   Mr. Shallcross fixed the arrears of rent to June 15, 1888, at $825.   John Simon, however, continued on the premises a year longer and paid no rent himself; but the rent, Mr. Shallcross testified, was fully paid up to January 1, 1890.   No receipts for such payment were produced by Mrs. Britton, those presented by her, although dated in 1889, being for rent due in October, 1888.   Her counsel claimed that she was entitled to a credit of $585, that amount of goods having been bought at the sale of John's effects at the farm and turned over to John.   The auctioneer declared that Wm. Simon bought them for John's use. Whether all of the moneys received by Mrs. Britton on her brother's account were actually disbursed by her on his account is in doubt, but the calculation need not be gone into further.

\*    \*    \*    \*    \*    \*    \*    \*

And now, July 19, 1899, the account is confirmed nisi.

On exceptions, PENROSE, J., filed an opinion, the material portions of which are as follows :

We are not convinced, however, that the evidence justified the setting aside of the deed of October 24, 1888, of John Simon and wife and of the deed of December 21, 1888, by

Rebecca Slack and her husband, to Julia Britton, for the shares, respectively, of the grantors in the estate of their father, the testator. These deeds were duly executed and acknowledged at or about the time of their dates, and appear to have been at once put upon record. They were, it is true, of interests taking effect at the termination of an existing life estate, but the interests were absolutely vested, and subject to no contingency whatever. Such a conveyance in no respect resembles an assignment of a mere expectancy, as in Lennig's Appeal, 182 Pa. 485, as to which, as there is no present ownership at the time of the assignment, the latter is treated merely as a contract to convey, if the assignor ever becomes entitled, and subject, therefore, to all the principles which control courts of equity in proceedings to enforce specific performance, with regard to actual and adequate consideration, etc.

So far as appears, there was no attempt to impeach the validity of these deeds during the nine years that intervened between their execution and the hearing before the auditing judge, unless a note written in 1896 by counsel then representing John Simon, asking if Mrs. Britton would " transfer the interest back " to him, can be so regarded; but to this she promptly replied, by her counsel, A. J. Maloney, Esq., " that she purchased the interest of John Simon outright, and holds a deed to that effect; that it was not a temporary arrangement, nor for the purpose of protecting against the creditors of Simon, but was an absolute sale," and there the matter rested until the proceedings in 1899 before the auditing judge. John Simon admits that the conveyance was suggested by himself, his motive being, as he asserts, to protect his wife and children, "in case anything should happen; "in other words, as his testimony discloses, to put it beyond the reach of existing or contemplated creditors. Such a conveyance, it need scarcely be said, though voidable by creditors defrauded by it, is perfectly good as between the parties, and the absence of consideration is wholly immaterial. On the other hand, it was denied on behalf of Mrs. Britton that the conveyance had any such purpose, and it was asserted that the consideration was the assumption by her of debts of the vendor, followed by their subsequent payment, his judgment note to secure her for such

assumption having been surrendered to him at the time of the conveyance.

\*      \*      \*      \*      \*      \*      \*      \*

But it is a fact not to be overlooked in the consideration of the exceptions, that Mrs. Britton, who is the sister of Mrs. Slack and John Simon, was not examined as a witness before the auditing judge, and naturally this led to an unfavorable inference, and created suspicion. Her absence, it is said, was caused by her illness, and an offer was made at a later period, after the testimony had closed and the questions involved had been decided by the auditing judge, to produce her as a witness, her health being then restored; but this was objected to, and the testimony was not taken. We think, under the circumstances surrounding the case, that the question as to the rights of the parties claiming under these deeds should not be decided until we are furnished with all the light that can be thrown upon the subjects involved. Regularly a proceeding to set aside a deed or to establish a trust is by bill in equity, with the right on the part of the complainant to probe the conscience of the respondent and to avail himself of all admissions in the answer, and with the right of the latter to claim the benefit of a responsive answer. The proceedings in the present case were necessarily of the most informal character, without pleadings of any kind, and with nothing on the record to show that an attack was contemplated. We are not convinced that the absence of Mrs. Britton was with the design of avoiding examination, and not by reason of actual illness; and the distribution of the assigned shares will therefore be suspended until her testimony has been taken before an examiner and submitted to the court, with leave to the parties to apply for further or other order.

The exceptions so far as they do not relate to these shares are dismissed, and the adjudication, modified with regard to the order striking out so much of the account as relates to the trust estate, is, except as above, confirmed absolutely.

Subsequently the court made the following order:

January 27, 1900. We think it preferable instead of appointing an examiner that additional testimony be taken before the auditing judge with the same effect as if upon a motion for a reargument.

The adjudication is recommitted to the auditing judge, to enable the parties to produce additional testimony, or for a further consideration thereof by him as justice and equity may require.

The supplemental adjudication was as follows:

By direction of the court in banc this case came back to the auditing judge to take and pass upon the testimony of two witnesses, Julia A. Britton and Madge Kessler, both of them parties to the record, who were not present at the original hearing. John Simon, the son, had declared that Mrs. Britton had consented to hold his share of the decedent's estate in trust for the benefit of his wife and children and had prepared a deed which he executed, which, however, proved to be an absolute conveyance to Mrs. Britton. After the death of the testator's widow, when the interest of the son vested in possession, his wife was told by Mrs. Britton that it would depend on John's actions whether she would or would not reconvey the property. At the present hearing Mrs. Britton testified that in 1888 John Simon offered to sell his interest for $1,000, and that she bought it from him at that price by paying $50.00 in cash and giving back to him the judgment note which he had executed in her favor for rent which she had assumed for him, and which she afterwards paid in full by moneys which she borrowed from Mr. Dickinson. On November 1, 1889, John Simon was again in arrears for rent, $530, and through a bill of sale to Mrs. Britton, a sale of his effects were made in her name, which realized $1,331.54. Out of this the rent of $530 was paid and goods amounting to $585 in value were bought for John, which, in connection with orders signed by him, consumed the whole sum. She denied that she had ever received from her mother $1,000 or any other amount with which to pay John's debts, but asserted, on the contrary, that John had always been a burden to his mother and had persistently called upon her to relieve him from the effects of his improvidence, and had even forged her name to notes which she was compelled to pay.

The auditing judge cannot find in this testimony any reason for changing the opinion which he expressed in the adjudication. Against the declaration of Mrs. Britton that John had offered to sell his interest is opposed the declarations of

John and his wife that she had agreed to hold his interest in trust, and these in turn are supported by the inherent probabilities of the case. The allegation was that John had agreed to sell an interest worth $12,000 in consideration of the payment of his debt of $950 of rent money and $50.00 in cash; but, on the very day in which he made this offer, Mrs. Britton had already assumed this rent for him, so that all present fear on that score was removed and no occasion remained for a sale. There was, however, a strong incentive to declaring a trust for his wife and children. He had so read the will, the language of which, on this point, was peculiar, as to believe that unless he aliened his share it would not be assured to his issue, and, according to his statement at the time of the conveyance, he desired to protect his wife and children in case anything should happen to him. He probably meant the happening of business reverses. The auditing judge denies that there was anything unlawful in this purpose. The grantor swore that his debts were all paid or secured, and they seem to have been. Certainly a solvent man may, without fraud upon future creditors, make a valid deed of trust by which he relinquishes all title to his property and passes it over in trust for his wife and children for their exclusive benefit. How could a subsequent creditor complain of fraud if, at the date of his credit to the debtor, he was confronted by the record of a deed of trust which showed that the debtor had already conveyed away his property? That a trust was intended by the grantor was shown by his own testimony as to the declarations of the grantee at the time of the execution of the deed, and by the testimony of his wife as to the declarations made afterwards by the grantee. It was also shown by the fact that he conveyed a $12,000 interest for practically no consideration whatever; a circumstance which is entirely reconcilable with the theory of a trust for wife and children, and is entirely repugnant to the theory of a sale.

The conveyances through which the title to the share was alleged to have passed to Madge Kessler were found by the adjudication to have been part of a scheme to defraud. The most emphatic proof that they were never intended to divest the ownership of the property from Mrs. Britton was given by Mrs. Britton herself. At the hearing she was asked this question: "Because you gave him (John Simon) his judgment

note and $50.00 in cash, you think you are now entitled to the one-seventh interest in his father's estate belonging to John?" and she replied, "Yes, sir; because he sold it to me for that. Q. You think you are entitled to one-seventh interest in this estate, do you? A. Yes, sir. I do indeed. Q. The one seventh belonging to John? A. Yes, sir. Q. And that it is your property to-day? A. Yes, sir."

The records of the common pleas, which were not submitted at the original audit, furnish a more solemn admission, and, in the opinion of the auditing judge, are in the nature of a complete estoppel to Mrs. Britton's denials of John Simon's rights. The fund now for distribution is mainly composed of the proceeds of sale of decedent's realty. In March, 1893, proceedings in partition were begun (C. P. No. 4, March term, 1893, No. 586) by Julia A. Britton v. John Simon, Rebecca Slack et al., reciting that each party was entitled to an interest of one seventh. The master's report found that the property was vested as alleged in the bill and awarded the purparts accordingly; the parties accepted service of notice and severally declared that they would file no exceptions and that they approved of the same; and the court, on October 17, 1893, confirmed the partition and decreed that the title to the purparts in severalty should vest in the respective parties to whom, by the report of the master, they had been allotted. Here, then, in October, 1893, some years after the conveyance to Mrs. Britton, was a judicial award by a master, which was approved in writing by Mrs. Britton, and confirmed by the court, and in which the title to one seventh of one of the purparts was found to be in John Simon. This record was in absolute harmony with the claim of John Simon that he had never sold his interest, and was a distinct confession by Mrs. Britton that she had never bought it. The auditing judge thinks that it concludes the case.

\*        \*        \*        \*        \*        \*        \*

The auditing judge thinks that the adjudication and decree as written should be confirmed. The filing of this readjudication was postponed at the request and on account of the sickness of counsel.

The court (PENROSE, J., absent), entered a decree dismissing exceptions to the supplemental adjudication.

450, (1902).]    Assignment of Errors—Argument.

*Errors assigned* were in dismissing exceptions to supplemental adjudication.

*Clifton Maloney*, for appellant.—Simon cannot recover on mere parol proof that a trust was intended, for a parol promise to hold in trust, even if no consideration was paid for the transfer, cannot be enforced: Barry v. Hill, 166 Pa. 344.

There must be fraud shown in the procuring of the conveyance sufficient to convert the grantee into a trustee ex maleficio: Kimmel v. Smith, 117 Pa. 183; Martin v. Baird, 175 Pa. 540; Braun v. First German Evangelical Lutheran Church, 198 Pa. 152.

The testimony to establish such a trust ex maleficio, must be "clear, precise and indubitable:" Kimmel v. Smith, 117 Pa. 183; Martin v. Baird, 175 Pa. 540; Monticelli v. Friedman, 193 Pa. 545; 5 Pepper & Lewis's Dig. of Decisions, col. 8715.

To overcome the deed itself there must be the testimony of at least two witnesses, or one witness and corroborating circumstances equivalent to another: Thomas & Sons v. Loose, Seaman & Co., 114 Pa. 35; Sylvius v. Kosek, 117 Pa. 67.

The circumstances of the execution of the deed from Simon to Mrs. Britton show that there was an absolute sale to her.

Simon's own story that a trust was intended to be created is flimsy, improbable and unbelievable, and showed no fraud upon him.

The overwhelming testimony of the persons present at the execution of the deed shows that it was a sale.

The inherent probabilities are that it was a sale: Murphy v. Hubert, 16 Pa. 50; Page v. Williamsport Suspender Co., 191 Pa. 511.

Simon's claim is barred by his delay in seeking relief: Christy v. Sill, 95 Pa. 380; Barry v. Hill, 166 Pa. 344.

The evidence against the deed was insufficient in law: Davidson v. Little, 22 Pa. 245; Whelen v. Phillips, 151 Pa. 312.

The partition proceedings in the court of common pleas have no bearing on this case: Ihmsen v. Ormsby, 32 Pa. 198; McClure v. McClure, 14 Pa. 134.

Madge Kessler is a bona fide holder for value.

The nonjoinder of Mrs. Britton's husband in her deed to

Kessler cannot be taken advantage of by Simon. If that deed was void by reason thereof, the effect would be to leave the share vested in Mrs. Britton. It could not effect a reconveyance to John Simon: Black v. Tricker, 59 Pa. 13; Orrell v. Van Gorder, 96 Pa. 180; Mitchell on Real Estate and Conveyancing in Pa. 261; Hoey v. Furman, 1 Pa. 295.

*Arthur W. Depue, Chas. H. Burr, Jr.*, and *Thomas Leaming*, for appellee, cited: Seichrist's App., 66 Pa. 237; Darlington's App., 86 Pa. 512; Neal v. Black, 177 Pa. 83; Rick's App., 105 Pa. 528; Horn v. Buck, 8 Atl. Repr. 609; Freelove v. Cole, 41 Barbour, 318.

OPINION BY RICE, P. J., July 10, 1902:

By the will of John Simon, deceased, there became vested in his son, John F. Simon, subject to the gift of the whole estate to the testator's widow for life or widowhood, one full seventh part and one sixth of two thirds of another seventh part of the entire estate, real and personal. Another one seventh became vested in Rebecca Slack, a daughter of the testator. The disposition of the other shares of one seventh each need not be referred to. By codicil the testator provided that if his son John should die seized of the whole or any part of his share, said share should go to his son's children and issue per stirpes, and in default of issue, to his executors in trust to pay the net income of said share to his son's wife for life, and the principal at her death to testator's grandchildren then living, but with full power to his son to alien the whole or any portion of his share or interest in the estate, if he should see fit to do so. The testator empowered his executors to sell all or any part of his real estate, but provided: "This power of sale, however, is not to be construed to work an equitable conversion, or change the nature of any property."

At the audit of the final account of the administrator d. b. n. c. t. a. of the estate of the testator, involving the distribution of a fund derived from sales of real estate, the share, to which, under the will, John F. Simon would have been entitled, was claimed by Madge Kessler, this appellant. John F. Simon also claimed it notwithstanding his deed conveying his interest in the real estate, to which we shall presently re-

fer. At the same audit, Julia A. Britton claimed by deed from Rebecca Slack the share to which, under the will, the latter would have been entitled. Rebecca Slack also claimed it notwithstanding her deed. Although the proceedings were necessarily informal, there being no pleadings, yet in the presentation of the evidence relative to each of these shares substantially the same course was pursued, as if a formal issue had been made up between Madge Kessler and John F. Simon and a similar issue between Julia A. Britton and Rebecca Slack, and the proceeding in each case had been in form, as it was in effect, a proceeding to determine the ownership of each of these shares. In view of the mode of procedure followed at the hearing of the two claims in the court below, as shown by the transcript of the evidence filed by the auditing judge, we feel warranted in confining our attention to the evidence adduced on the hearing of the appellant's claim to the share of the testator's real estate devised to John F. Simon. Moreover, although her title was derived through Julia A. Britton, we cannot see that her rights can be affected by the fraud, if there was a fraud, by means of which Mrs. Britton obtained Mrs. Slack's share.

The appellant's title to the share is derived through the following conveyances : October 24, 1888, deed, John Simon and wife to Julia H. Britton for his share of the testator's real estate, recorded on October 30, of the same year ; November 24, 1896, deed, Julia A. Britton to Edward Kessler for the same premises; April 15, 1897, deed, Edward Kessler and Madge, his wife, to Nicholas J. Fitzgerald ; same date, deed, Nicholas J. Fitzgerald to Madge Kessler. The auditing judge concluded from the evidence, that the first mentioned deed was fraudulently procured by Mrs. Britton, and that there was a resulting trust in favor of the grantor; also, that neither Edward Kessler, nor Madge, his wife, was a bona fide purchaser for value without notice. The court dismissed the exceptions filed by Madge Kessler and confirmed the adjudication, made after a rehearing, awarding the share of the fund in dispute to John Simon. The principal propositions, to which the argument of the appellant's counsel was addressed, are, that the circumstances of the execution of the deed from Simon to Mrs. Britton show that there was an absolute sale to her free from any trust; that

the evidence against the deed was insufficient in law, because it was not clear, precise and indubitable, because it rested on the uncorroborated testimony of the grantor, and because it showed no fraud on the part of the grantee ; that even if the testimony of Simon be credited, he cannot recover, because, according to his own story, he made the deed to defraud his creditors; and that his claim is barred by his delay in seeking relief. It seems to us appropriate, before entering upon a discussion of these objections to the adjudication, to determine whether Madge Kessler is in a position which gives her a right to raise them.

It appears that at the date of her deed to Edward Kessler, Julia A. Britton was a married woman ; and as her husband did not join in the deed, it was prima facie void, not merely voidable at his election. The Act of June 8, 1893, P. L. 344, did not change the law in this respect, but expressly provided that a married woman " may not mortgage or convey her real property unless her husband join in the conveyance." But it further appears that on February 11, 1899, the court of common pleas made a decree declaring Julia A. Britton entitled to all the rights and privileges of a feme sole trader. Such decree and the certificate issued pursuant thereto are conclusive evidence that on the day it was entered, and from that day until revoked by the court, the feme covert was entitled to all the privileges of a feme sole trader conferred by the acts of 1718 and 1855 ; but we cannot adopt the suggestion of appellant's counsel as to its relation back to the date of the separation of the parties. We cannot see that it has any effect, either as evidence or otherwise, upon the question of Mrs. Britton's status at the date of her deed to Kessler. True, a decree is not indispensable to the enjoyment of the privileges conferred by the feme sole trader statutes; all that is necessary is proof of the facts which would entitle her to such decree : Black v. Tricker, 59 Pa. 13 ; Elsey v. McDaniel, 95 Pa. 472 ; Orrell v. Van Gorder, 96 Pa. 180. But there is no finding by the auditing judge that at the date of the deed in question the facts existed which entitled her to the privileges ; and if her husband testified to the truth in stating the cause of his separation from her, we are not prepared to say that there was such neglect or desertion on his part as is contemplated by the act of

1855. In King v. Thompson, 87 Pa. 365, Mr. Justice PAXSON said: "There must be desertion or a neglect or a refusal on the part of the husband—something that involves the wilful nonperformance of a duty on his part." It seems unnecessary, however, to further consider the evidence bearing upon the question of his desertion; for it is well settled by the decisions that one who has been decreed a feme sole trader has power to convey her real estate without her husband joining in the deed: Wilson v. Coursin, 72 Pa. 306; Foreman v. Hosler, 94 Pa. 418; Moninger v. Ritner, 14 W. N. C. 99. See further, 8 P. & L. Dig. of Dec. col. 13910. So that, whatever may have been the status of Mrs. Britton at the date of the delivery of her deed to Edward Kessler, it is clear that at the date of this distribution she had the same power to convey the share in question or to ratify the conveyance she had previously made, as if she had become discovert. The cases which decide that a married woman's deed, being absolutely void, cannot be ratified by any subsequent act short of a new deed subsequently acknowledged in the form required by the statute, have reference to acts done while the disability of coverture remains. After the disability has been removed, ratification may be implied from acts less solemn, as was clearly shown by Judge BARKER in his review of the cases in Jourdan v. Dean, 175 Pa. 599. Mrs. Britton appeared as a witness in support of Mrs. Kessler's title to the share devised to John Simon and of her claim to the share of the fund for distribution represented thereby. She was not only a witness but was also a party to the proceeding, claiming another portion of the fund. If she desired to repudiate the deed she had given and claim the John Simon share of the fund also, then was the time for her to speak; but she could not be compelled to take that position against her will: Meade v. Clarke, 159 Pa. 159. She unequivocally elected not to do so, but to affirm her sale, so far, at least, as this particular fund is concerned. She is bound by her decision, and no one else has any standing to complain. We conclude, therefore, that Madge Kessler has a right to be heard in opposition to the decree awarding the share in question to John Simon. She was entitled to it, if he was not.

It will be appropriate, also, to dispose of the question raised by the thirteenth assignment of error, before entering upon a

discussion of the merits of the case as disclosed by the oral testimony. It appears that in 1893 a bill in equity for the partition of a piece of land held by John Simon, Sr., and William Simon as tenants in common was filed in the court of common pleas. Julia Britton and others were plaintiffs and William Simon and others, including John Simon, this appellee, were defendants. The bill averred the tenancy in common; the death of John Simon, Sr., seized of an undivided one-half part; the devises of his will including the devise to John Simon as hereinbefore set forth; that all the parties named in the said will were then living; that a small portion of the land had been sold; that no partition or division of the remaining portion had been made between the parties interested; and prayed that a partition of the same " be made between the estate of John Simon, deceased, and the said William Simon." It is stated in the appellee's paper-book that answers admitting the facts were put in by the defendants; but these are not printed. It appears, however, that a master was appointed, who, after hearing, reported, inter alia, as follows: " John Simon's one-half interest is vested in the parties to this suit under the provisions of his will . . . . All the parties interested desire that the partition be made in conformity with said prayer, and for that purpose said real estate should be divided into two purparts of equal value, one of which should be allotted to the parties interested under the will of John Simon, deceased, and the other to the said William Simon." Accordingly he divided the land into two purparts, each of which was of the value of $25,000, and allotted purpart number one to Sarah Simon for life or widowhood, " and at her death or marriage said purpart is awarded to the parties in remainder, as fully appears by and under the terms and conditions of the will of the said John Simon, deceased." He concluded his report by saying, " and as the parties interested in the estate of the said John Simon, deceased, take the land by and under the provisions of his will, the master is of the opinion and therefore reports that no assurances or conveyances are necessary for carrying into full effect the decree of the court confirming the awards and allotments herein made." The parties accepted service of notice of the filing of the report in writing, wherein they stated that they did not desire to file any exception thereto, but approved

the same. Accordingly the court confirmed and approved the report and decreed that the "partition remain firm and stable in vesting the title to the purparts in severalty in and to the several and respective parties to whom and in and by the said report the said purparts have been awarded and allotted." The learned auditing judge in his final adjudication held that this record was in absolute harmony with the claim of John Simon, that he had never sold his interest, and was a distinct confession by Mrs. Britton that she had never bought it, and was in the nature of a complete estoppel which concluded the case.

We express no opinion as to the correctness of the foregoing conclusion, so far as it relates to the land awarded to the parties interested under the will of John Simon. But we fail to see how, by any proper application of the rule as to res judicata, the decree can be held to be a conclusive adjudication as to the validity of a deed not before the court and as to land not embraced in the partition. The fact, if it be a fact, that Mrs. Britton saw fit not to set up her title to the John Simon share of the land which was the subject of that suit cannot, of itself, estop her to set up her title to the John Simon share of other lands: Ihmsen v. Ormsby, 32 Pa. 198; Kapp v. Shields, 17 Pa. Superior Ct. 524, and cases there cited. If she had set up her title under the deed from him and the decision had been against her or if it appeared that the fund for distribution consisted wholly or in part of the proceeds of the sale of the purpart awarded to the parties in interest under the will of John Simon, a different question would be presented. After a careful examination of the evidence and the record, we fail to find either of these facts. To make a matter res judicata there must be, amongst other things, identity of subject-matter, and this appears to be lacking, or at least is not shown here. We therefore sustain this assignment of error.

In the view we take of the case it is unnecessary to recite at length the testimony upon which the appellant relies to sustain the deed from John Simon to Julia Britton. But we are clearly warranted in saying that if the testimony of Mrs. Britton, A. J. Dickinson, A. J. Maloney and T. Fernley Brooks (they were the only persons present besides John Simon) as to what occurred on the day the deed was executed is to be believed there was an absolute sale for a valuable consideration, and

the transaction was free from fraud or trust. In refusing to adopt this conclusion, the learned auditing judge was apparently very much influenced, amongst other things, by the supposed discrepancy between the value of the property and the consideration expressed in the deed. True, it was admitted at the audit "that the estate consists of about $60,000 of real estate and $10,000 of personalty," according to which estimate John Simon's share of the entire estate was worth then in the neighborhood of $11,000. But it is objected that there is no evidence as to the value of his share of the real estate at the date of the deed, or as to the knowledge or belief of the parties upon that subject; and it is to be borne in mind that this was nearly ten years before the life estate of the testator's widow terminated, and, of course, it was uncertain when it would terminate. In view of the meager and unsatisfactory evidence as to the value of the share in October, 1888, we think there is great force in this objection. But it is not our purpose to attempt to show that the court ought to have accepted the version of the transaction which the appellant's witnesses gave. It is sufficient for present purposes to show, that there was a positive denial that a fraud was practised upon the appellee. Nothing to impeach the deed was admitted by silence or otherwise. The burden of proof rested on John Simon, and was the same as if he had been plaintiff in a bill in equity to which a responsive answer had been filed, which was supported by the testimony of all the witnesses present at the execution of the deed except himself. If in this situation, the evidence introduced by him was insufficient in quality or quantity to warrant a chancellor in decreeing a cancelation of the deed, he must fail. The deed then stands as conclusive evidence of the appellant's title, and consequent right to the fund. In other words, it is not sufficient for him to raise a doubt as to the truth of the version of the transaction given by her witnesses. We therefore proceed to a review of his testimony.

John Simon testified on three different occasions as to the circumstances under which and the purpose for which the deed from him to Julia Britton was given. The first occasion was in July, 1892, in a proceeding to remove the executors. Being asked to relate the circumstances that induced him to transfer his interest in his father's estate to his sister, he said: "At the

time I made this assignment, I owed several people some money, and I had a sale of my stock and crops, and there was not sufficient money to pay them; and I made this assignment to keep them from selling my interest and give me a little time to make up the money." There was nothing elicited upon his cross-examination to qualify this unequivocal admission made under oath, within four years after the date of the deed. But further on in his direct testimony, when asked to relate what occurred in the lawyer's office where the deed was executed, he said: "I sold my interest to her for the sum of $1,000. She gave me a check with William Bender's name on, for the amount, indorsed by Mr. Dickinson. The check was taken from me again, going down the steps, before I reached the street, and after I had left Mr. Maloney's office."

The second occasion upon which he testified as to his purpose in giving the deed was at the first hearing, in the present proceeding, which was eleven years after the date of the deed. On this occasion he testified in explanation of the transaction, that the rent for a farm he had leased was in arrears, that a levy had been made by his landlord on the stock and other personal property, and that thereupon, in the summer of 1888, he made a bill of sale of his effects to his sister Mrs. Britton, she engaging with the agent of his landlord to pay the rent in his stead. "After that"—we now quote from his testimony— "Mrs. Britton came to my place. Mrs. Britton, my wife and I were in the house, and I asked Mrs. Britton if she would take my interest in the estate and hold it in case anything should happen to me for the benefit of my wife and children, so that they could get what was coming to me, as father wished by his will. She said she would." A week later, but not by previous appointment, he, in company with Mrs. Britton and one Dickinson, who seems to have had very much to do with the management of her affairs, went to a clothing store in Philadelphia. We again quote from his testimony: "We went to the clothing store, and after we came out of that, I asked Mrs. Britton if she would make this paper out, that is, the transfer from us to her. Q. That is the transfer you mean of what now—of your interest in your father's estate? A. Of my interest in my father's estate for the benefit of my wife and children. Q. That is, in trust for your wife and children? A. Yes, sir;

Mr. Dickinson then spoke up and said he did not think it could be done. So we walked up Market street to Sixth and down to Chestnut to Mr. Maloney's office, and we stood out on the street and Mr. Dickinson went upstairs, and he came down and said it was all right." He further testified, that when they entered Mr. Maloney's office, the latter "had the deed and a book in his hand and there was a man there making out a deed;" that he, the witness, gave no instructions as to the contents of the deed; that before it was finished Dickinson gave him the Bender check for $1,000, referred to in his former testimony; that Mr. Maloney asked him to sign the deed, which he did; and that after they went out his sister grabbed the check from his hand and said, "That is the way we fixed Aunt Eliza." Being asked what he said or thought of this rather remarkable incident, he gave the equally remarkable answer, that he thought it was merely a form and said nothing. Upon cross-examination he stated in the most positive and unequivocal terms that the transfer was made at his suggestion. We quote from his testimony: "Q. At whose suggestion was this transfer made? I am referring to this deed. A. It was mine. Q. It was at your own suggestion? A. It was at my own suggestion. Q. Mrs. Britton never endeavored to persuade you to make any such assignment? A. I asked her to take it and hold it in trust for my wife and children, in case anything should happen, my wife would get the benefit of it according to father's will. Q. What do you mean by that—in trust for your wife and children? A. To hold this until the time that the estate was settled up. Q. Why did you want that done? A. In case anything happened to me. Q. What do you mean by that—in case anything happened to you? A. I do not know it was that I would go in business anytime and would not succeed, or what it was. You don't know what is going to happen." It is to be borne in mind, that, according to the foregoing testimony, the first suggestion of the transfer was made by John Simon, himself, and this was about a week before the deed was executed, which was on October 24, 1888.

Upon consideration of exceptions to the first adjudication filed by the auditing judge, the case was referred back to him for further proceedings in the nature of a rehearing. In the opinion of the court in banc upon these exceptions, Judge PEN-

ROSE said: "John Simon admits that the conveyance was suggested by himself, his motive being, as he asserts, to protect his wife and children, in case anything should happen to him; in other words, as his testimony discloses, to put it beyond the reach of existing or contemplated creditors. Such a conveyance, it need scarcely be said, though voidable by creditors defrauded by it, is perfectly good as between the parties, and the absence of consideration is wholly immaterial." That these comments upon his former testimony influenced his testimony upon the rehearing, either by refreshing his recollection or otherwise, cannot be asserted as a fact. But it is a fact that at the rehearing he testified that in July or August, 1888, his sister stated to him—we quote from his testimony— " that as I had trouble with my interest in the estate before, it would be wise to let her have it in case I should be in difficulties, or that I should die, my wife and children would be better off than before." This was inconsistent with his testimony on the former hearing. He admitted, however, that this was several weeks before the signing of the deed, and that the final suggestion pursuant to which the transfer was made came from him. He also introduced into the evidence a motive for the transfer not before suggested, as appears by the following question and answer: " Q. What was your purpose in transferring your stock on this farm and your interest in the estate and everything to your sister—was it that your debts should be paid or what? A. For my debts to be paid." But he immediately qualified this by saying: "I done it for this reason, in case I should get into business again and meet with reverses, that my wife and children should get what father left."

We remark, first, with regard to his testimony that it is not clear and consistent in material particulars. What did he mean when he said that he made the conveyance in order that his debts might be paid? If he meant that it was to secure his sister in the undertaking she had entered into to pay some of his debts, how can this be reconciled with other portions of his testimony? Is it to be inferred from his testimony that he intended the beneficial interest in the property to go to his wife and children in any event or only in the event of something happening to him? Viewing his testimony as a whole, the latter is the more probable theory, but it cannot be

denied that some portions of his testimony would seem to support the former theory. Whether the transfer was first suggested by him or by his sister was a question of the highest importance. If the suggestion came from her and was the inducement for his action, it is almost inconceivable that he should have forgotten that most important fact at the first hearing, when his attention was specifically directed to that matter, and when he testified in the clearest and most positive terms, both in the direct examination and in his cross-examination that he suggested it. Second, if the testimony at the hearing before the auditing judge is to be construed as meaning that what he had in view was the happening of business reverses in the future, and this only, then it is utterly irreconcilable with the testimony he gave in the proceeding to remove the executors. This was less than four years after he had given the deed. Presumably his recollection of the transaction and of his indebtedness was more distinct then than it was eleven years after the date of the deed. As to his indebtedness, he testified as follows: "Q. How much were you indebted at the time you made this assignment, that you were unable to pay? A. That is impossible for me to tell. Some of them I have paid since, and some I have not. When I get $10.00 I go and pay, and have paid over $100 this week. Q. Can you tell how much you owe now? A. Not over $300; except what I owe my mother and the estate; except a judgment note of about $677 to William Wolstencroft and Sons. Q. Have you ever demanded back the assignment of your interest? A. No, sir. Q. Do you know how much you owe the estate. A. I do not know the exact amount; they are in judgment notes I have given. Q. That is equally true of the amount you owe your mother? A. Yes sir. Q. When your mother loaned you money, she gave it to you herself? A. Yes, sir. Q. How was it you got money from the estate? A. The money that I got from the estate was money that I received from outsiders upon my notes indorsed by my father; and the estate paid them? Q. You don't know whether William or your mother paid them? A. I do not. The notes were returned to me and I gave a judgment note for them." It cannot be said that when he testified that he made the assignment to keep his creditors from selling his interest and give him

time to raise the money, he did not understand the meaning of his words. There is nothing to show that in that proceeding he had any motive for falsifying. To say that he had, and that it influenced his testimony would not help the matter; it would only go to show that he was willing to suit his testimony to the exigencies of the case and is not a credible witness.

To sustain a decree by which, in effect, a deed which had stood on record without attack for eleven years, is set aside at the instance of the grantor, the evidence must be clear, precise and indubitable; by which is meant, that "it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testify, that they narrate the details exactly, and that their statements are true:" Thomas & Sons v. Loose, 114 Pa. 35; Spencer v. Colt, 89 Pa. 314. It is unnecessary to cite other authorities in support of this statement of the law. The rule is familiar and well established. It seems to us that the testimony of John Simon will not bear this test, and that we might end the discussion here. But if from his sworn declarations and admissions made on the three separate occasions above referred to, we were compelled to deduce a specific finding as to the purpose of the conveyance, we should be compelled to say, that he contemplated a secret trust, and that his purpose was, not merely to put the property beyond the reach of future creditors, so that in the contingency of his going into business and failing his wife and children would have the benefit of it, but also to put it beyond the reach of existing creditors, at least temporarily. We do not see how this conclusion can be avoided without convicting him of wilful falsehood at the hearing when the transaction was freshest in his recollection, and when, so far as appears, he had no interest to serve by giving false testimony. As already suggested, to adopt the latter theory would not help his case. We remark in addition that the testimony of his wife at the first hearing is not necessarily inconsistent with the foregoing conclusion. A man who has made a voluntary conveyance of all his property in fraud of creditors cannot elect to set the conveyance aside, nor enforce a secret trust for his own benefit, or, as we shall presently see, for the benefit of his wife and children. His lips are closed. This, indeed, is in obedience to the general prin-

ciple that where the parties to a fraudulent contract have fully executed it themselves, courts of justice will not interfere to unravel their doings; but, considering them in in pari delicto, will leave them bound as they found them. The application of this principle to the case of a conveyance in fraud of creditors is unquestionable. We need not cite the numerous authorities in which it has been made; but the language of the Supreme Court in Murphy v. Hubert, 16 Pa. 50, is so closely pertinent here that we quote it: "If there be a point settled on reason and authority, it is that a deed intended to defraud creditors, although void as against creditors, yet is valid as against the grantor, and those for whose benefit it is designed, whether it be the grantor himself, his child or children, or a stranger. The grantee holds the property as against the fraudulent grantor and his beneficiaries, the latter being considered in the light of volunteers, without consideration and consequently placed in no better situation than the grantor, discharged from all secret trust whether in writing or by parol." It is no answer to say that the grantor hoped and intended to pay his debts ultimately, if the intended effect of the collusive assignment was to withdraw his property from the reach of his creditors for a time, and thus hinder and delay them. To hold otherwise would be to put it in the power of the debtor to impose his own terms of payment regardless of the rights of his creditors, which is not permissible under the statute of 13 Elizabeth. See Hennon v. McClane, 88 Pa. 219, and the cases there cited.

There is another feature of the transaction, as presented by John Simon's testimony, to be considered in connection with the foregoing. The fact that the transfer was made upon his own suggestion, and without any undue influence, persuasion or misrepresentation on the part of Mrs. Britton, we think is established by his own testimony. There is no finding by the auditing judge that he was deceived or misled as to the contents of the deed which he signed, or, even, that it differed in form from what he intended it to be. We do not see how it can be said that she procured the deed by fraud. Her fraud upon him, if there was a fraud, consists in the breach of her parol promise. But this, according to the doctrine of well considered cases, two of these quite recent, is not sufficient to

make her a trustee ex maleficio. In Kellum v. Smith, 33 Pa. 158, decided in 1859, Mr. Justice STRONG said: "It may in all cases be assumed that when a promise is made to buy or hold for another, confidence is invited and more or less reposed. So it is in every parol contract for the purchase of lands; but the statute of frauds would be worse than waste paper if the breach of the promise created a trust in the promisor, which the contract itself was insufficient to raise." In Barry v. Hill, 166 Pa. 344, decided in 1895, the above language was quoted with approval. There the trial court rejected an offer to show that a certain assignment by deed of ground rents by John Bardsley to Thomas Gannon was made without consideration, upon the agreement between the parties that they were to be sold subject to the exclusive ownership of John Bardsley and that Thomas Gannon had no interest in them, and also as to these ground rents John Bardsley received the interest for his own use after the date of the assignment. It was contended on appeal that the proof, if received, would have established a trust ex maleficio in favor of Bardsley and, therefore, of his successors in the title. It was contended for the appellee that the proof offered would not establish a trust ex maleficio, and if it would, the trust was barred by the statute of limitations. Mr. Justice GREEN, who delivered the opinion of the Supreme Court, said: "It seems to us that both of these objections are fatal to the offer. A trust ex maleficio can only result from some act of bad faith, and a mere refusal to perform a parol contract to hold or convey land is not sufficient to create such a trust." After pointing out the fact that it was not proposed to prove that Gannon ever denied the alleged parol agreement, or that he made any effort to prevent Bardsley from taking the rents, or that he ever asserted title in himself, or did any act in contravention of the agreement, Justice GREEN further said: "But even if the offer had gone further, and alleged a breach of the parol agreement, it would not have been sufficient." The foregoing statement of the law was quoted with approval in the very recent case of Braun v. First German Evangelical Lutheran Church, 198 Pa. 152. See also Martin v. Baird, 175 Pa. 540.

Without further elaboration we conclude that John Simon has not established, by clear, precise and indubitable testimony,

his right to the fund notwithstanding his deed, even though it be conceded, which is not clear, that Edward Kessler was not a bona fide purchaser for value. It follows that the share in question should have been awarded to Madge Kessler, the appellant. The decree awarding the share of the proceeds of sales of real estate, which under the will of John Simon, deceased, would have gone to John Simon, the appellee, is reversed so far as it relates to that matter, and it is now ordered and decreed that said share be awarded to Madge Kessler, the appellant; and the record is remitted to the court below with directions to carry this decree into effect; the costs of the appeal to be paid by the appellee.